IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| MAX KIRBY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 12-5045-CV-SW-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying his application for disability benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in November 1956, has a high school education, and has prior work experience as a machinist. He filed his application for disability benefits under Title II in November 2005, initially alleging he became disabled on October 30, 2002, due to possible diabetes and problems with his heart, neck, lungs, and urinary system. As will be discussed further below, Plaintiff later added allegations based on anxiety, anger control issues, and other related matters. Plaintiff's insured status expired on September 30, 2009, so the critical issue is whether Plaintiff was disabled between October 30, 2002, and September 30, 2009.

In the last week of October 2002, Plaintiff experienced a heart attack and underwent a heart catheterization and angioplasty. He was also encouraged to stop smoking (he smoked three packs a day) and change his diet. R. at 339-43.

There are no more medical records until January 2006, when Plaintiff was sent to Dr. Ali Abu-Libdeh on referral from the state agency for a consultative examination. Plaintiff complained of headaches that he had been experiencing for fifteen years (and for which aspirin provided relief), "twitches" in his left arm and left chest wall, a history of "joint popping and cracking," and the prior cardiac history mentioned above. Plaintiff denied that any of these conditions interfered with activities of daily living, and told Dr. Abu-Libdeh that lived "with his mother on a farm and is able to do some farm work and some yard work." Dr. Abu-Libdeh found nothing remarkable in his examination and concluded Plaintiff "does not appear to be disabled in spite of" Plaintiff's complaints and his 2002 cardiac issues. R. at 352-54.

On March 13, 2006, Plaintiff saw Dr. David Tucker (his primary medical provider), complaining about back pain and expressing concerns about diabetes. Plaintiff's blood sugar was extremely high, and he was still smoking two to three packs of cigarettes per day. Dr. Tucker referred Plaintiff to a dietician and prescribed Feldene (an arthritis treatment) and Ultram (a pain reliever) for his back problems. R. at 396. Two weeks later, Plaintiff's blood sugar had decreased. He reported feeling better although Feldene was not providing any relief. Dr. Tucker prescribed Voltaren (an anti-inflammatory). R. at 394.

On May 1, Plaintiff's blood sugar was "under markedly better control." He still complained of back problems, reporting that the Feldene still was not helpful and Dr. Tucker again prescribed Voltaren. Plaintiff returned two weeks later after falling into a septic tank hole that he was digging. Plaintiff reported pain in his right leg and hip, and Dr. Tucker prescribed Vicodin. R. at 421.

Plaintiff's next reported visit to Dr. Tucker was in January 2008. The purpose of the visit was for a regular exam and evaluation. Dr. Tucker listed Plaintiff's medications, which consisted of Actos (for diabetes), Zocor (for cholesterol), Plavix, Valium, Ultram and Feldene. It is not clear who prescribed Valium. In any event, Dr. Tucker's examination revealed nothing noteworthy; he refilled Plaintiff's medications and told him to return in two to three months. R. at 416. In March 2008, Plaintiff told Dr. Tucker he was "taking the Valium up to three times daily, is under a lot of stress and tension." Dr.

2

Tucker diagnosed Plaintiff as suffering from chronic anxiety and increased the Valium prescription. R. at 414.[1]

Thereafter, Plaintiff saw Dr. Tucker for medication management, but most of Dr. Tucker's treatment notes lack any assessments, diagnoses, or other information helpful to this case. R. at 442-504, 524-32, 538-545. However, in October 2009, Plaintiff saw Dr. Tucker for his yearly exam, and Dr. Tucker noted Plaintiff was "doing quite well. No particular problems or difficulties, no complaints . . . ." R. at 506. The following month Dr. Tucker completed a Medical Source Statement – Physical ("MSS – Physical"), indicating Plaintiff could lift or carry fifteen pounds frequently and twenty pounds occasionally, stand or walk for thirty minutes at a time and three hours per day, sit for fifteen minutes at a time and two hours per day, and that Plaintiff would need to lie down for twenty to thirty minutes every two to three hours per day. R. at 517-18.

Meanwhile, In February 2006, the state agency referred Plaintiff to a psychologist for a mental examination. The psychologist, Dr. Geoffrey Sutton, noted Plaintiff did not allege any mental impairments, the records did not demonstrate the existence of any mental impairments, and Plaintiff had no mentally-related functional impairments. R. at 363-76. In October 2007, the state agency referred Plaintiff to another psychologist (Dr. Alan Ramsey). Plaintiff told Dr. Ramsey that he had anger control issues and described himself as depressed because he had not worked in the past five years. Dr. Ramsey administered a Mental Status Exam that revealed Plaintiff's "ability to attend to a task does appear to be impaired" but nothing else of note. Nonetheless, Dr. Ramsey diagnosed Plaintiff as suffering from a dysthymic disorder and a personality disorder and assessed his GAF at 43. R. at 401-02. In July 2008, Plaintiff saw Dr. Modaser Shah, who diagnosed Plaintiff as suffering from alcohol abuse and borderline personality disorder. R. at 429. A few days later – after that sole visit – Dr. Shah completed portions of a Medical Source Statement – Mental ("MSS – Mental") and checked boxes indicating Plaintiff suffered marked limitations in eight areas of functioning. However, Dr. Shah cautioned that he had "seen [Plaintiff] only once and

---

[1]Plaintiff testified Dr. Shah prescribed the Valium, R. at 65, which may be true: Dr. Shah's records are hard to read. However, if this is so it is not clear why Dr. Tucker would increase the dosage. Ultimately, there appears little doubt that somebody prescribed Valium.

3

the data base is limited." Some boxes were not marked and Dr. Shah noted he lacked sufficient data to opine in those areas as well. R. at 431-32. Thereafter, between July 22, 2008, and September 22, 2009, Plaintiff saw Dr. Shah seven times (each appointment lasting fifteen minutes). While Dr. Shah's handwritten notes are difficult to read, they appear to reflect that Plaintiff continued to exhibit signs of irritability. R. at 434-40. In December 2009, Dr. Shah partially completed another MSS – Mental, indicating Plaintiff was markedly limited in his ability to maintain attention and concentration, perform activities and maintain attendance in accordance with a schedule, work with others, complete a normal workday without interruption from psychological symptoms, and accept instructions and criticism from supervisors. R. at 520-21. In April 2010, Dr. Shah completed a medical statement indicating Plaintiff had marked limitations in activities of daily living and that he experienced repeated epsidoes of deterioration or decompensation in work or work-like settings. Dr. Shah also wrote that Plaintiff's "chronic severe anxiety and depression are complicated by his personality problems, which can lead to antagonizing loved ones and sources of help, as well as authority figures." R. at 533-34.

     During the hearing on August 2, 2010, Plaintiff testified that he and his wife still lived on his mother's farm. He mows the yard (which consists of two acres) with a riding mower, which can take up to four hours. He takes his mother to town if she needs to go, which is approximately twenty miles away. R. at 44-45. Plaintiff also helps maintain the equipment on the farm. R. at 56. He told the ALJ he was taking Meloxicam (an anti-inflammatory) and aspirin for the pain in his back and hips. R. at 48. These medications, along with the medications prescribed for his heart and diabetes, upset his stomach, make him drowsy, and caused him to have muscle spasms. R. at 49-50, 59. The pain in his back and neck had been present for ten years and make it difficult to bend over, and grasping objects or using a hammer makes the pain worse. R. at 64-65. While he had been advised to exercise, Plaintiff admitted that he was only fulfilling half (or less) of the recommendation because he gets too tired. R. at 50. As late as 2005 Plaintiff continued to perform full-time work for short durations, anywhere from one to four weeks at a time; the duration of these jobs was dictated by the amount of time needed to complete them and was not related to Plaintiff's physical or mental

4

capabilities. R. at 52-55. He testified he could walk for 100 feet before having to stop, could stand for up to an hour before having to lie down, could occasionally lift fifty pounds and frequently lift ten pounds. R. at 57-58. Because of his drowsiness, he takes three, three-hour long naps per day. R. at 59-60. Plaintiff also testified that he gets moody, upset, and angry rather easily. R. at 61-63.

The ALJ elicited testimony from a vocational expert ("VE"). The ALJ asked the VE to assume an individual of Plaintiff's age, education, training, and work history who was limited to light work with the option to sit and stand, would not be required to do either for more than one hour at a time, who needed to avoid exposure to dangerous machinery or heights and who is limited to simple, routine, repetitive tasks and no more than occasional interaction with supervisors. The VE testified that such an individual could not return to their past relevant work but could work as an office helper, storage facility rental clerk, or recreation aid. R. at 68-69. Plaintiff's counsel then asked the VE to assume the limitations set forth in Dr. Shah's December 2009 MSS – Mental; the VE testified such an individual could not perform work in the national economy. R. 70. The VE was then asked to assume the limitations set forth in Dr. Shah's July 2008 MSS – Mental, and again the VE testified such an individual could not work. R. at 70-71. Finally, the VE was asked to assume the limitations set forth in Dr. Tucker's MSS – Physical, and once again the VE testified that all work would be precluded. R. at 71.

The ALJ found Plaintiff to be limited in the manner described in his hypothetical question. In rejecting Plaintiff's subjective testimony, the ALJ found not only an absence of medical evidence to support such severe limitations, but further noted that Plaintiff's testimony was not consistent with what Plaintiff reported to his doctors. The ALJ found Plaintiff's diabetes and heart problems were well-controlled. R. at 25. Plaintiff's daily activities were inconsistent with the limitations he alleged. R. at 27. With regard to Plaintiff's mental impairments, the ALJ discounted Dr. Ramsey's assessment because it was inconsistent with the narrative portion of his notes, which reflect "that the claimant exhibited no bizarre or unusual gestures or mannerisms, and had no loose or bizarre thought associations," and could perform adequately in almost all mental activities. R. at 26. The ALJ give little weight to Dr. Shah's first MSS – Mental because it reflected limitations that were inconsistent with Plaintiff's daily activities, Dr. Shah had

5

not performed any tests at that time, and Dr. Shah formed this opinion after only one appointment. R. at 27. Dr. Shah's later MSS – Mental was discounted because it was inconsistent with Dr. Shah's contemporaneous treatment notes. R. at 27. Based on his findings and the VE's testimony, the ALJ concluded Plaintiff could not return to his past work but retained the residual functional capacity to perform other work in the national economy.

Plaintiff appealed this decision to the Appeals Council. The Appeals Council granted the request for review and, in doing so, indicated that it was going to consider whether to vacate a separate decision, made at the administrative level, to award Plaintiff Supplemental Security Income benefits. The Appeals Council ultimately adopted the ALJ's findings and conclusions with respect to Plaintiff's application under Title II, and vacated the award of Supplemental Security Income benefits. R. at 4-8. In so doing, the Appeals Council found that the evidence did not support Dr. Shah's December 2009 or April 2010 statements, particularly in light of the conflict between those statements and the contents of Dr. Shah's contemporaneous treatment notes. R. at 4-8. However, the issue before the Court remains the underlying decision regarding Plaintiff's application for disability benefits under Title II.

## I. DISCUSSION

### A. Application of the Medical-Vocational Guidelines

Plaintiff first argues that the Appeals Council improperly applied the Medical-Vocational Guidelines, and that proper application compelled a finding of disability. Plaintiff argues that he turned 55 on November 22, 2011, which moved him from the category "closely approaching advanced age" to the category for "advanced age." The Appeals Council rendered its decision in February 2012, and in applying the Guidelines treated Plaintiff as "closely approaching advanced age."

There is no need to consider whether Plaintiff would be entitled to benefits if he were in the "advanced age" category because there was no error in failing to place him in that category. Plaintiff's insured status expired on September 30, 2009, so he had to

6

Case 3:12-cv-05045-ODS   Document 13   Filed 02/11/13   Page 6 of 8

be disabled on or before that date to be entitle to Title II benefits.  Even if Plaintiff later entered "advanced age," the Appeals Council applied the Guideline properly because on the relevant date Plaintiff was still "approaching advanced age."

## B.  Sufficiency of the Evidence: Medical Opinions and RFC

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion."  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

The precise nature of Plaintiff's argument is not stated consistently.  The heading for this argument contends "the medical opinions of record support . . . significantly more limitations than [the ALJ] assessed."  Plaintiff's Brief at 10.  This suggests Plaintiff is contending the ALJ failed to properly defer to or consider the medical evidence.  Later, Plaintiff criticizes the ALJ for "disregarding" the doctors' opinions.  Plaintiff's Brief at 12.  However, Plaintiff seems to back away from this position by contending "[t]he issue is not whether the ALJ properly disregarded the professional opinions of record.  Instead, the issue is whether substantial evidence supports" the RFC found to exist by the ALJ.  Plaintiff's Brief at 12.  The Court will focus on the actual argument instead of the heading because (1) that seems like the reasonable course and (2) Plaintiff does not press his suggestion that the ALJ should have deferred to the medical opinions in the Record.

7

Plaintiff argues the RFC is not supported by substantial evidence because no medical evidence mirrored the RFC. The argument imposes a requirement that is more stringent than the law dictates. While "a claimant's RFC is a medical question, . . . in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). It is simply not true that the RFC can be proved *only* with medical evidence. Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam). It is also not true that the RFC must precisely coincide with a doctor's opinion. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("the ALJ is not required to rely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." (quotation omitted)).

The ALJ's findings were consistent with Plaintiff's daily activities. While the findings did not (and did not need to) mirror any of the doctors' opinions, they were consistent with the treatment notes and other records. The ALJ relied on all the evidence in the Record in formulating Plaintiff's RFC and the ALJ's finding is supported by substantial evidence in the Record as a whole.

### III. CONCLUSION

The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: February 11, 2013           UNITED STATES DISTRICT COURT